# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MAURICE BROWN, for himself and on behalf of his minor child, AMIR BROWN, | |
| Plaintiffs, | Case No. 21-CV-01397 |
| v. | Judge John Robert Blakey |
| THE CITY OF CHICAGO, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Maurice Brown and Amir Brown (collectively, "Plaintiffs") sue the City of Chicago (the "City"), and numerous Chicago police officers (the "Officers") alleging civil rights violations in connection with the Officers' search of Plaintiffs' home. [28]. The City and Officers (collectively, "Defendants") jointly move to dismiss Count I (unreasonable seizure) and Count II (unreasonable search) of Plaintiffs' complaint. [29]. The City moves separately to dismiss Count III, a *Monell* claim stemming from the alleged mistreatment of two-year old Plaintiff Amir Brown. [31]. For the reasons explained below, the Court denies Defendants' motions, [29] and [31].

## I.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all inferences in the plaintiff's

favor. Courts are not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and allege facts that are "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are not enough. *Id*. The complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## II. Complaint's Allegations

The Court recites the facts assuming the truth of Plaintiffs' allegations.[1] It was a rainy and cold morning in mid-March. [28] ¶¶ 11–12, 15, 18. Plaintiff Maurice

---

[1] The following facts are drawn from Plaintiffs' Second Amended Complaint [28] and the search warrant, attached as Exhibit A [29-1] to Defendants' joint motion to dismiss [29]. Under the incorporation-by-reference doctrine, a court may consider "documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (alteration in original) (citations omitted). Because the Court finds that the search warrant is "critical to the complaint and referred to in it," the Court may consider it at the motion to dismiss stage. *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also* [28] ¶¶ 7–8, 13, 20, 27. The parties dispute whether the Court may properly consider body-worn camera ("BWC") footage also attached to Defendants' joint motion to dismiss. Because the BWC footage poses a more complicated question, the Court addresses the parties' arguments in depth below.

Brown and his family were fast asleep in their home just south of Chicago. *Id.* ¶ 7. While the family slept, 40 law enforcement officers surrounded the home in a semi-circular fashion. *Id.* ¶¶ 7, 9. The Officers, an amalgamation of Chicago police officers and members of the Special Weapons and Tactics ("SWAT") unit, were "heavily armed with loaded assault rifles." *Id.* ¶ 9. They were there to execute a search warrant targeting the location and an individual named Denokey Midderhoff ("Midderhoff"). *Id.* ¶ 8; [29-1].

In a flurry, the Officers erupted with noise and light diversions, "calling" the family "out of the house over a bullhorn." [28] ¶ 7. Roused from their sleep, the family exited their home. *Id.* ¶ 9. Plaintiff Maurice Brown stepped out into the 37-degree weather with his hands overhead, followed by his girlfriend, Sharron, who held two-year-old Plaintiff Amir Brown. *Id.* ¶ 16. Additional family members hurried out into the rain, including three other children—all under the age of nine. *Id.* ¶ 9. According to Plaintiffs, they did not have time to prepare for the weather; Plaintiff Amir Brown was carried outside without shoes or socks on his bare feet. *Id.* ¶¶ 15, 18, 19. The target of the search warrant, then nineteen-year-old Midderhoff, stepped outside alongside the family and was immediately apprehended without incident by the armed officers. *Id.* ¶ 13; [29-1].

Despite safely securing the target of the search warrant, the Officers kept their loaded weapons trained on the family. [28] ¶¶ 9–10. The Officers handcuffed Plaintiff Maurice Brown tightly, despite his compliance with all of the Officers' requests. *Id.* ¶¶ 13, 14, 43, 41; *see also id.* ¶ 20 ("At no time during the execution of

3

the search warrant did Plaintiff Maurice Brown refuse to follow instructions, resist arrest, attempt to flee, or pose any threat whatsoever to any of the officers at any time."). The Officers kept the family outside for the duration of the search, approximately 45 minutes according to Plaintiffs, during which time Sharron made several requests to the Officers. *Id*. ¶¶ 15–18. First, she asked permission to place Plaintiff Amir Brown down, as she was struggling to hold him. *Id*. ¶ 16. The Officers refused. *Id*. Next, she asked permission to change Plaintiff Amir Brown's soiled diaper. *Id*. ¶¶ 17–18. Again, the Officers refused. *Id*. ¶ 17. Then, Sharron asked if she could tend to Plaintiff Amir Brown, now crying, as he was "not wearing shoes, was cold, rain-soaked, and needed his diaper changed," to which one of the Officers replied: "You're just going to have to f----- deal with it!" *Id*. ¶ 18.

While the family remained corralled outside, the Officers conducted their search inside. *Id*. ¶ 22. The Officers entered the home, a "split single family residence," in search of a "two-tone .9mm caliber semi-automatic Smith and Wesson handgun, a black unknown caliber adjustable bump stock Assault Rifle, and any other unlawfully possessed handgun and ammunition[.]" [29-1]. The Officers were also authorized, pursuant to the warrant, to seize any "paraphernalia for maintaining firearms, and photographs of individuals with firearms, any records of firearms transactions and proof of residency." *Id*. In searching for the weapons and related paraphernalia, the Officers allegedly "deployed a loud explosive" device "ripping a hole in the second-floor ceiling and causing toxic dust and debris to coat the residents'

clothing and belonging[s]." [28] ¶ 22; *see also* ¶¶ 23, 27. The search left the home "unnecessarily damaged and otherwise trashed." *Id.* ¶ 23.

The alleged ordeal for Plaintiffs did not end there: "Following the search, the family members were brought back inside from the cold" but remained "detained within the home for close to two hours." *Id.* ¶ 24. At this point, the Officers allowed Plaintiff Maurice Brown's aunt to take custody of Plaintiff Amir Brown to "get him dry, clothed, and into a clean diaper." *Id.* ¶ 19.

Hours after their arrival, the Officers left. No guns or contraband were found during the search. *Id.* ¶¶ 25–26.

## III. Analysis

Defendants collectively move to dismiss all counts of Plaintiffs' complaint. [29], [31]; *see also* [28] ¶¶ 33–67. In short, Defendants argue that the Officers acted well within their authority, [29] at 6–8, that the mode and manner of the Officers' entry, search and seizure were reasonable, *id.* at 11–13, and that Plaintiffs' complaint fails to set forth sufficient factual matter to plausibly demonstrate each element of a cognizable *Monell* claim, [31] at 3.

### A. Body-Worn Camera ("BWC") Footage

As a threshold matter, the parties disagree on whether the Court can properly consider BWC footage attached to Defendants' joint motion to dismiss at this preliminary stage. [29-2], [29-3], [29-4], [29-5]. Generally, in deciding a motion to dismiss, courts cannot consider evidence outside the pleadings without converting the motion into a motion for summary judgment under Rule 56. *Tierney v. Vahle*,

304 F.3d 734, 738 (7th Cir. 2002). Defendants nevertheless attempt to fit the BWC footage into a well-recognized exception to the otherwise resolute rule: under the incorporation-by-reference doctrine, the BWC footage can properly be considered because the footage is "central to the allegations in this case [and] consist[s] of video footage of almost the entire underlying incident." [29] at 5–6. Plaintiffs vehemently disagree, arguing first that the complaint only references BWC footage in passing (in reference to their *Monell* claim); second, the four videos attached do not "capture the entirety of the event alleged in the complaint and the actions of all thirty-nine Defendant Officers" during the search, as the initial call-out was not captured. [35] at 7 ("Defendants admit that the SWAT Officers, the individuals responsible for the call-out and for clearing the residence, were not equipped with BWC.").

In support, Defendants place primary reliance on *Scott v. Harris*, 550 U.S. 372 (2007). [29] at 4–5. There, Harris sued police-officer Scott under § 1983 for excessive force resulting in an unreasonable seizure following a high-speed chase. *Id*. at 375–76. At summary judgment, the United States Supreme Court considered a videotape of the incident that "utterly discredited" Harris' account, rendering it a "visible fiction." 550 U.S. at 380–81. As between the videotape of unchallenged authenticity, *id*. at 378, and the plaintiff's narrative, the Court held that the videotape carried the day, reasoning that where the plaintiff's account is "blatantly contradicted by the record," such that "no reasonable jury could believe it," courts should view the "facts in the light depicted by the videotape." *Id*. at 380–81.

Following in the footsteps of *Scott*, the Seventh Circuit has, at times, permitted video evidence to seep into the pleadings at the motion to dismiss stage. Take *Bogie v. Rosenberg*, 705 F.3d 603 (7th Cir. 2013). In *Bogie*, the Seventh Circuit held that the trial court had not erred by relying on a backstage video attached to plaintiff's breach-of-privacy complaint. *Id*. at 608–09. The Court explained that the video demonstrated "in real time the content and context of the alleged wrongs," and thus the district court had properly "viewed the recording and weighed its content against the complaint's allegations" to determine whether plaintiff had been filmed in a setting that a reasonable person would view as private. *Id*.

Likewise, one year earlier in *Brownmark Films*, the Seventh Circuit reviewed videos attached to the defendant's motion to dismiss in resolving a copyright dispute that turned on the applicability of fair use. 682 F.3d at 690. Because the attached videos were "the only two pieces evidence needed" to decide the case, the court found that they were truly "central to the claim" of copyright infringement. *Id*. And, while there was a paucity of authority applying the incorporation-by-reference doctrine to videos, including television programs, the court noted that "it makes eminently good sense to extend the doctrine to cover such works, especially in light of technological changes that have occasioned widespread production of audio-visual works." *Id*. at 691.

Other trial courts have also embraced the extension of *Scott*'s reasoning to the motion to dismiss in certain cases. In *Flores Delgado v. City of Chicago*, the trial court faced the same "difficult question" presented before the Court today, namely

"the proper use of video evidence at the motion to dismiss phase." 547 F. Supp. 3d 824, 830 (N.D. Ill. 2021). The camera footage, captured by the camera of a police vehicle (and attached to the complaint), showed a clash between a minor and a Chicago police officer. *Id*. at 826. Relying on *Bogie*, the court exercised discretion and reviewed the video. *Id*. at 830 ("[T]he Court is free to consider any facts set forth in the complaint that undermine the plaintiff's claim. This discretion includes exhibits attached to the complaint, such as video recordings attached to or referenced in a complaint."). The court noted that in view of *Bogie* and *Brownmark*, "when an exhibit 'incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss,'" *id*. (quoting *Bogie*, 705 F.3d at 609, and citing *Brownmark*, 682 F.3d at 690–91); *see also Henderson v. Rangel*, No. 19-CV-06380, 2020 WL 5642943, at *2 n.1 (N.D. Ill. Sept. 21, 2020) (applying incorporation-by-reference doctrine to BWC footage attached to defendants' motion to dismiss). After reviewing the footage, the court nonetheless found that it did not clearly contract the plaintiff's factual allegations, especially because it presented "an arguably incomplete depiction of the incident." *Flores*, 547 F. Supp. 3d at 831 ("The Court cannot definitively find at this stage that the video 'incontrovertibly contradicts' Plaintiff's allegations.").

In *Tate v. City of Chicago*, without objection by the parties, the trial court considered videos referenced in the Plaintiffs' complaint and attached to the defendants' motion to dismiss. No. 19-CV-7506, 2020 WL 6715660, at *1 (N.D. Ill. Nov. 16, 2020). The court reasoned that "the Seventh Circuit has held that it is proper

to consider videos that are incorporated by reference in a complaint on a motion pursuant to Rule 12(b)(6)." *Id.* (citing *Bogie*, 705 F.3d at 609); *see also id.* ("So in addressing Defendants' motion, the Court considers facts readily apparent from the videos along with Plaintiffs' allegations."). As here, the BWC footage at issue depicted only a portion of the relevant search. *Id.* ("The first several minutes of Defendants' search of Plaintiffs' apartment were recorded by the defendant officers' body worn cameras.").

Similarly, in *Hyung Seok Koh v. Graf*, the trial court reviewed a video that was referenced in the complaint and attached to the defendants' motion to dismiss. No. 11-CV-02605, 2013 WL 5348326, at *9 (N.D. Ill. Sept. 24, 2013). There, the video at issue captured "the entire interrogation" subject to a coerced-confession claim, "or at least large chunks of the interrogation" with the interrogating officer "either present on screen or . . . heard off-screen during the entirety of the tape." *Id.* Because coercion of a confession is based on "the totality of the circumstances of the interrogation," the court found that the "video is therefore relevant and helpful when assessing whether it contradicts [plaintiffs'] factual allegations" about the nature of the interrogation. *Id.*

In this case, the Court declines to consider the BWC footage at issue as part of the motions to dismiss. In order to apply the "narrow" doctrine of incorporation-by-reference, the BWC videos need to be referenced in the plaintiff's complaint and central to his claim. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). While Plaintiffs make passing reference to officer body-cameras in their complaint, *see* [28]

at ¶ 45, the Court cannot say that the videos are "central" to Plaintiffs' claims, at least not "central" in the same manner as in the *Bogie* and *Brownmark* cases. In both of those cases, resolution of the disputes hinged upon the videos themselves, which formed the very basis of the plaintiffs' respective claims. Here, while the videos will provide key insights into the allegedly unreasonable events that took place on the morning of March 15th, the videos are not themselves dispositive of the facts at issue and Plaintiffs could have brought this § 1983 case if the BWC footage never existed. *See Hyung Seok Koh*, 2013 WL 5348326, at *9 (differentiating from *Brownmark* on the grounds that "[Plaintiffs'] claims center around an interrogation that just so happens to have been filmed[.]"). Given the Plaintiffs' objections, the footage cannot be deemed "central" to the complaint in this case in the same way as the footage at issue in *Bogie* and *Brownmark*.

The other district court decisions do not compel a different conclusion. In *Flores*, unlike here, the dashcam video at issue was attached to the plaintiffs' amended complaint and referenced at length therein, and "when a plaintiff attaches to the complaint a document . . . and her complaint references and relies upon that document in asserting her claim, the contents of that document *become part of the complaint* and may be considered as such when the court decides a motion attacking the sufficiency of the complaint." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (emphases added). In *Hyung Seok Koh*, unlike here, the footage provided a complete picture of the interrogation, rather than only select portions of the relevant events from certain individual perspectives. 2013 WL 5348326, at *10 (dismissing

10

the concern that there are "physical limitations with video footage that show only one perspective on a scene," as the video at issue "capture[d] the entire interrogation"); *see also Flores*, 547 F. Supp. 3d at 831 ("[T]he fact that the video does not capture all of Officer Oeinck's movement compels the Court to find that the claim against Officer Oeinck must survive the motion to dismiss." (quoting *Felton v. City of Chi.*, 827 F.3d 632, 637 (7th Cir. 2016))). And in *Tate*, unlike here, plaintiffs did not object to the court's consideration of the video footage at issue. 2020 WL 6715660, at *1.

In declining to consider the BWC footage, the Court remains mindful of the delicate balance struck by the incorporation-by-reference doctrine. On the one hand, if passing references were sufficient to justify consideration, courts would "grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Levenstein*, 164 F.3d at 347. If, on the other, plaintiffs could avoid an application of the doctrine through carefully crafted assertions and omissions, then courts would run afoul of the very aim of the doctrine—preventing parties from "surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *118 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

While the Court declines to consider the footage today, the litigants should be reminded that if video footage "exists that clearly contradicts" plaintiffs' story, an "early and cost-efficient motion for summary judgment might be appropriate" (including, if warranted, a motion for sanctions if counsel failed to comply with Federal Rule of Civil Procedure 11). *Felton*, 827 F.3d at 637; *In Re Ronco, Inc.*,

838 F.2d 212, 217 (7th Cir. 1988) ("The failure of an attorney to make an objectively reasonable investigation of the facts underlying a claim or the applicable law justifies the imposition of Rule 11 sanctions.").

### B.    Count I: Unreasonable Seizure

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV.  To state a claim for an unreasonable seizure, a plaintiff must allege that: (1) the officers seized the plaintiff; and (2) the seizure was "unreasonable." *See Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010).  In determining whether a search was unreasonable, courts "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted).  The analysis is "inherently fact-dependent, requiring consideration of such factors as the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting the officers." *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Court views the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," bearing in mind that "police officers are often forced to make split-second judgments." *Id*. (citations omitted).

### 1.    Plaintiff Maurice Brown

Plaintiff Maurice Brown's claim arises from his allegations that the Officers handcuffed him outside in near-freezing temperatures for over an hour before transferring him inside where he remained handcuffed for another two hours.  [28] ¶¶ 11, 24.  He alleges that the handcuffs remained far too tight, despite complaining to the Officers that he was in pain.  *Id*. ¶ 14.  In addition, he claims that the Officers unnecessarily pointed loaded assault rifles at him "with their fingers on the trigger." *Id*. ¶ 9.  Plaintiff Maurice Brown asserts that his detention was unreasonable because he was not the target of the warrant, he did not resist the officers, and he did not otherwise attempt to flee, destroy evidence or otherwise interfere with the search underway.  *Id*. ¶ 20.

A warrant to search for contraband founded on probable cause "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  *Michigan v. Summers*, 452 U.S. 692, 705 (1981).  Among the reasons for this authority is the government's interest in preventing flight, minimizing the risk of harm to the officers, and allowing the search to proceed in an orderly and effective manner.  *Los Angeles Cnty., Cal. v. Rettele*, 550 U.S. 609, 614 (2007).  Law enforcement officers' authority to detain subject to a search warrant is "categorical" and does not depend on "the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure."  *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705 n.19).  Moreover, the analysis does not change merely because Plaintiff Maurice Brown was not the target of the warrant,

13

as any person present during the search may be detained for its duration. *See United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (individuals who enter perimeter of search area may be detained while that search is underway); *United States v. Pace*, 898 F.2d 1218, 1239 (7th Cir. 1990) (individuals present at the premises being search may be detained, even though they may not be residents or occupants). Although three and a half hours is a lengthy period of time to be detained, Plaintiff Maurice Brown does not allege that his detention was prolonged unnecessarily; he was detained for the alleged duration of the search. The Supreme Court has previously upheld a "two-to-three" hour detention in handcuffs as reasonable. *Mena*, 544 U.S. at 100; *Billups v. Kinsella*, No. 08 CV 3365, 2010 WL 5110121, at *5 (N.D. Ill. Dec. 9, 2010) (same). The Court finds that the duration alone does not render the seizure unreasonable.

The lawfulness of a detention incident to the execution of a warrant, however, is not evaluated only as of its inception; the intrusiveness of the detention over time may render it unreasonable. *Mena,* 544 U.S. at 99. Here, the Plaintiff has alleged that he posed no real threat to the officers and indicated his willingness to comply with their orders.[2] Thus, Plaintiff Maurice Brown argues that his detention was unlawful because several of the "Officers were heavily armed with loaded assault rifles and had their fingers on the triggers" when he exited the residence with his

---

[2] Defendants argue that Plaintiff Maurice Brown became "agitated" at the scene and posed a risk to officer safety. [38] at 6. At the pleading stage, however, this Court must accept all well-pleaded facts as true and draw all reasonable inferences from those allegations in Plaintiffs' favor. *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992). Plaintiff Maurice Brown states that "[a]t no time during the execution of the search warrant did [he] refuse to follow instructions, resist arrest, attempt to flee, or pose any threat whatsoever to any of the officers at any time." [28] ¶ 20.

family during the initial "call out." [28] ¶ 9. As the Seventh Circuit has held, "gun pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment." *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009).

Nevertheless, if "there is reason to fear danger," then it may be reasonable for law enforcement officers to brandish their weapons. *Id.* at 346. Here, in view of the warrant, the Officers had reason to believe that there may be a threat to their safety; the Officers were executing a warrant for a "two tone .9mm caliber semi-automatic Smith and Wesson handgun, a black unknown caliber adjustable bump stock Assault Rifle," and any other "ammunition" or "paraphernalia" relating to firearms. [29-1]. The Officers also had a reason to believe that a potentially dangerous individual was present, as the warrant authorized law enforcement officers to locate the ostensible proprietor of those firearms, Midderhoff, and to collect any "proof of residency." *Id*. In addition, during the call out, the Officers did not know who was exiting the residence or if the target of the search warrant was in fact present. Therefore, even though Plaintiff Maurice Brown may not have been the target of the warrant, the Officers still possessed credible reasons to believe that a threat to their safety existed—rendering the use of their weapons reasonable. *Cf. Baird*, 576 F.3d at 344 (finding use of a submachine gun unreasonable where the alleged crime—altering a special identification number—was "a far cry from crimes that contain the use of force

as an element, crimes involving possession of illegal weapons, or drug crimes, all of which are associated with violence").[3]

Next, handcuffs. Plaintiff Maurice Brown alleges in the complaint that the Officers "unreasonably and unnecessarily handcuffed [him] in front of his young son," and that the handcuffs "were on too tight and caused him to be in pain which he communicated to Defendant Officers." [28] ¶¶ 11, 14. The Seventh Circuit's "cases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). Framed as a "right," a person has the "right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury." *Rooni v. Biser*, 742 F.3d 737, 742–43 (7th Cir. 2014); *see also Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003) ("It [is] also well established that it [is] unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes."). *Cf. Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (explaining that the Seventh Circuit has, "*on occasion* recognized valid excessive force claims based on overly tight handcuffs" (emphasis added) (citations omitted)). Of course, whether an officer "knows that a given action

---

[3] As discussed below in connection with Plaintiff Amir Brown, it remains to be seen whether the Officers continued to point the weapons at Plaintiffs following the initial call out—Plaintiffs' complaint is equivocal on this front.

unnecessarily will harm a particular individual will depend upon the circumstances of the arrest." *Stainback*, 569 F.3d at 772. In some cases, the fact that "an act will cause pain or injury will be clear from the nature of the act itself," while in others, "it may become clear to an arresting officer that, although a particular action would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury to the particular individual being placed under arrest." *Id.* Either way, the Seventh Circuit has recognized that the "key" to whether an officer's use of handcuffs violates the Fourth Amendment is whether the officer knew the handcuffs would cause unnecessary pain or injury. *Day v. Wooten*, 947 F.3d 453, 462 (7th Cir. 2020).

The question of whether a particular use of handcuffs offends the Fourth Amendment is thus a highly fact-intensive one. Plaintiff Maurice Brown's allegations are threadbare; he alleges only that his "handcuffs were on too tight and caused him to be in pain which he communicated to Defendant Officers." [28] ¶ 14. The complaint provides no indication of whether he "communicated" that the handcuffs were causing him pain more than once; whether he detailed to law enforcement that he was in pain or experiencing numbness; or even that he suffered any redness or physical harm from the offending handcuffs. *Cf. Tibbs*, 469 F.3d at 666 (rejecting plaintiff's arguments where plaintiff suffered "discomfort and pain," "complained once about his handcuffs without elaborating on any injury, numbness, or degree of pain" and "experienced redness on his wrists for less than two days; and neither sought nor received medical care for any alleged wrist injury").

17

This is, however, a motion to dismiss. A complaint is "not required to allege all, or any, of the facts logically entailed by the claim," nor does it "fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrong." *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (citation omitted). These factual issues, and thus Defendants' challenge, are more appropriately left for a motion for summary judgment, not a motion to dismiss. *See Grafton v. Fobelk*, No. 18-CV-6099, 2020 WL 7398785, at *4 (N.D. Ill. Dec. 17, 2020) ("A determination as to whether a seizure is reasonable is a fact intensive argument, and therefore the Court finds that it is inappropriate on a motion to dismiss."); *see also Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir. 1978) ("Where the pleadings raise a contested issue of material fact, a Rule 12(b)(6) motion must be denied."); *see also Liqui-Box Corp. v. Scholle IPN Corp.*, 449 F. Supp. 3d 790, 800 (N.D. Ill. 2020) (the purpose of a motion to dismiss is to test the sufficiency of the complaint, accepting all well-pleaded allegations are true, not to decide the merits or resolve factual disputes). Plaintiff Maurice Brown's allegations give fair notice of the nature of his claim.[4]

### 2. Plaintiff Amir Brown

Two-year-old Plaintiff Amir Brown's unreasonable seizure claim arises from the allegations that the Officers pointed loaded assault rifles at him, [28] ¶¶ 9, 35, forced him to remain outside in the 37-degree weather for "at least 45 minutes"

---

[4] The parties present competing factual scenarios regarding the handcuffs in view of the BWC footage. As explained above, the Court declines to extend the incorporation-by-reference doctrine and will not resolve factual disputes on a motion to dismiss. *See Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993) (holding that resolving issues of fact are "inappropriate for resolution in a motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(6)"). Nevertheless, the Court reiterates that an early summary judgment motion may be appropriate. *See supra* at 11–12 (quoting *Felton*, 827 F.3d at 637).

without shoes or socks, *id.* ¶ 15, and in a soiled diaper, *id.* ¶¶ 17–19. The complaint provides that the Officers could have no plausible basis for using any force against Plaintiff Amir Brown—much less excessive force—given his youth. As the Seventh Circuit has recognized, cases finding constitutional violations "so often involve children because they are much less likely to present the police with a credible threat." *Baird*, 576 F.3d at 346.

To start, the "age of a person on the other end of the gun is a relevant factor when assessing reasonableness." *Cruz v. City of Chi.*, No. 20-CV-250, 2021 WL 2645558, at *6 (N.D. Ill. June 28, 2021). The complaint provides that during the initial call out, the Officers held their weapons at the family as the family stepped out into the cold morning. In so doing, the Officers pointed their weapons—"loaded assault rifles"—at Plaintiff Amir Brown "and had their fingers on the triggers." [28] ¶ 9. Plaintiff Amir Brown was, at the time the incident occurred, a small toddler (albeit in the hands of an adult posing a different individual threat assessment). [35] at 11. Moreover, Plaintiff Amir Brown himself, according to the complaint, posed no threat to the Officers or to the general community. These are the "very ingredients relevant to an excessive force inquiry." *McDonald by McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992).

While these ingredients remain relevant to the excessive force inquiry, they may not be sufficient to state a constitutional violation. The complaint does not indicate whether the Officers holstered their weapons upon apprehending the subject of the warrant or otherwise securing the premises; nor does it make clear that the

Officers kept their rifles aimed at the family for an unreasonably prolonged period of time. As explained above, the Officers had reason to fear for their safety during the initial call out and Plaintiffs have not provided any suggestion that the Officers knew that children were present.[5] In view of the complaint, it is possible that the Officers held their guns at the family only until they apprehended the target of the warrant and secured the premises. It may also be the case that the Officers continued to point their guns at the family well beyond the need to do so. These factual issues are better left for another day. At the motion to dismiss posture, it suffices that the complaint— when "taken as a whole"—invites the reasonable inference that the Officers continued to point their weapons at the family after apprehending Midderhoff and after realizing that the family (and children) posed no credible threat to their safety. That inference stands to be corrected through discovery. *Atkins v. City of Chicago*, 631 F.3d 828, 832 (7th Cir. 2011) (noting that "the complaint taken as a whole must establish a nonnegligible probability that the claim is valid").

Plaintiff Amir Brown also alleges that it was "unreasonable for Defendants to keep Amir Brown, a toddler, in near freezing weather, without socks or shoes, covered in poop, rain-soaked, and crying for at least 45 minutes." [35] at 11. The parties dispute the amount of time that Plaintiff Amir Brown (and other children) spent outside. Nevertheless, in view of the allegations in the complaint—including the temperature, Plaintiff Amir Brown's attire and youth, the duration of the search, and

---

[5] In fact, Plaintiffs suggest the opposite; the Officers' failure to "to make reasonable efforts to determine whether children will be present prior to executing a search warrant [or] make reasonable efforts to execute search warrants at times when it is less likely children will be present," forms an integral component of Plaintiffs' *Monell* claim against the City. [28] ¶ 45.

the denials of multiple requests by family members to tend to the toddler or otherwise remove him from the scene—the Court finds that Plaintiff Amir Brown has sufficiently alleged that his detention was unreasonable under the circumstances.

### C.   Count II: Unreasonable Search

The Fourth and Fourteenth Amendments "provide a remedy when a citizen's property is unreasonably damaged during a search." *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) ("Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." (citing *United States v. Ramirez*, 523 U.S. 65, 71 (1998)). The Supreme Court has held that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). Yet "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Id*. at 258.

Plaintiffs have plausibly alleged that the Officers engaged in an unreasonably destructive search. Plaintiffs provide that during the search of the home, "Defendant Officers deployed a loud explosive device inside the home, ripping a hole in the second-floor ceiling and causing dust and debris to coat the residents' clothing and belonging[s]" which left the residence "unnecessarily damaged or otherwise trashed." [28] ¶¶ 22–23. This type of intrusive search may have been unreasonable in view of the warrant, which authorized the Officers to search for firearms, firearm paraphernalia, photographs and other documents proving residency, and in the

absence of any stated exigency. *See* [29-1]. Defendants again dispute whether an explosive device was, in fact, used during the search, but this is a motion to dismiss not a trial on the papers. *See Grafton*, 2020 WL 7398785, at *4.

### D.  Count III: *Monell* Liability

Plaintiffs assert a claim against Defendant City of Chicago under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Municipalities do "not face *respondeat superior* liability under section 1983 for the misdeeds of employees or other agents. Only actions of the entity will suffice." *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021). To "prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). Under *Monell*, municipalities are therefore only liable for constitutional violations when they are the "moving force" behind those violations. *Monell*, 436 U.S. at 694.

To establish a municipality's liability under *Monell*, a plaintiff must show that: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 535 (7th Cir 2005) (quoting *Ineco v. City of Chi.*, 286 F.3d 994, 998 (7th Cir. 2002)); *see also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

Plaintiffs allege that the City caused their constitutional rights to be violated because of "specific, long standing, interrelated, failures of official policy, lack of official policy, *de facto* policies, widespread practices and/or customs of the Chicago Police Department" concerning children. [28] ¶ 44. Specifically, Plaintiffs allege that the Chicago Police Department: (1) engaged in "a pattern and practice of using excessive force against children"; (2) declined "to investigate and discipline incidents of officer excessive force against children"; and (3) failed to develop an "official policy and training to avoid unnecessary or excessive use of force against and in the presence of children." *Id*. According to Plaintiffs, "Defendant Officers' conduct towards and in the presence of Plaintiff Amir Brown was undertaken as a direct consequence of Defendant City of Chicago's long-standing failure to have any affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against children." *Id*. ¶ 46.

The Court reads the complaint as "referring to a set of interrelated, mutually reinforcing customs or practices, all of which contribute to the civil rights violations alleged" by plaintiff. *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893 (N.D. Ill. 2016). While the crux of Plaintiffs' complaint appears to be that the Chicago Police Department promulgated deficient policies and procedures relating to excessive force used against and in the presence of children, Plaintiff also alleges that the Chicago Police Department maintains "a widespread 'code of silence' wherein police officers will not report misconduct committed by fellow officers." [28] ¶¶ 49–53. Plaintiffs allege that City's "policy-makers are aware of, and condone and facilitate by their

inaction, [the] 'code of silence' in the Chicago Police Department." [36] at 3 (citing *id.* ¶¶ 50–51). Specifically, Plaintiffs point to statements by former Mayor Rahm Emanuel and Mayor Lori Lightfoot, and invoke former Police Superintendent Eddie Johnson, who all either publicly acknowledged the asserted "code of silence" or otherwise "directly encouraged, allowed, acquiesced in, and/or turned a blind eye to the very type of misconduct" complained of. [28] ¶¶ 51–52; 65. In this way, Plaintiffs' complaint asserts both an official policy (or lack thereof) and widespread custom that were allegedly so persistent and widespread that policymakers knew, and should have known, about the behavior. *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001) (requiring plaintiff to allege fact tending to show "that City policymakers were aware of the behavior of the officers, or that the activity was so persistent and widespread that City policymakers should have known about the behavior").

In support, Plaintiffs rely on a report from the United States Department of Justice in 2017 (the "DOJ Report"), two years before the incidents forming the basis of the complaint. [28] ¶¶ 7, 56–57. The DOJ Report found that during the relevant timeframe, among other things, the Chicago Police Department maintained a pattern and practice of using excessive and "less-lethal force" against children and further that the Chicago Police Department's oversight of police misconduct contributed to a larger pattern and practice of unconstitutional conduct. The DOJ Report provides examples of law enforcement officers' use of physical force, tasers, canines, and handcuffs against children and young adults. Relevant here, the DOJ Report also describes officers brandishing weapons against children who posed no threat to law

enforcement and posits that the City was deficient in implementing and enforcing investigations of officer misconduct. Plaintiffs also point to an April 2016 Police Accountability Task Force Executive Summary (the "PATF Report"), which recognized existing tension between law enforcement and children—particularly children of color. *See* [28] ¶¶ 58–59 ("The report noted that 'Children in some areas of the City are not only being raised in high-crime environments, but they are also being mistreated by those who have sworn to protect and serve them.'").

The City argues that while the "DOJ Report and PATF Report were critical of many aspects of CPD, neither has anything to do with what the City's alleged customs were in 2019 with respect to children and search warrants." [21] at 7. While the Court agrees that none of the examples provided in the DOJ Report map neatly onto Plaintiffs' experience on the morning of March 15th, the complaints reference to the DOJ Report nevertheless increases the plausibility that: (1) the City's officers use excessive force against children (including by way of brandishing weapons in the presence of children); (2) the City's officers and agents have failed to investigate and discipline incidents of officer excessive force against children; and, (3) the City failed to develop trainings and policies designed to discourage the use of unreasonable use of force against children. *See Archie et al. v. City of Chicago*, 19 CV 4838, 2020 WL 5751185, at *3 (N.D. Ill. Sept. 25, 2020) (finding the DOJ Report to support plaintiffs' allegations of excessive force against children, the police accountability entities' failure to deter officers from using such force, and the City's failure to adopt training and/or policies discouraging excessive use of force against children). This is not a

situation in which a plaintiff's general conclusions regarding a municipality's "'broken' accountability systems" are "nebulously linked" to the claims asserted. *Cf. Carmona v. City of Chi.*, No. 15-CV-00462, 2018 WL 1468995, at *4 (N.D. Ill. Mar. 26, 2018) ("The DOJ Report certainly identifies serious shortcomings in the [Chicago Police Department's] supervisory systems, but the Court cannot countenance it as a master key to unlock discovery's door for any *Monell* claim against the City, no matter how scantily the plaintiff connects his claim to the report's findings."). In *Carmona*, relied upon by the City, the plaintiff not only failed to delineate the asserted constitutional violation subject to the *Monell* claim, *id.* at *3 (describing an "amorphous custom" and "deliberate indifference to a litany of constitutional rights"), but also failed to establish that the alleged custom extended beyond "*his* constitutional deprivation," *id.* (declining to credit plaintiff's stand-alone references "to three other individuals" where plaintiff did "not allege, even in conclusory form, that those individuals' constitutional injuries were the result of the widespread custom").

Here, Plaintiffs point to four specific examples that Plaintiffs allege "put the City of Chicago on notice regarding failed policies, practices and customs." [36] at 5–6; [28] at ¶ 63. Plaintiffs tie the proffered examples to their asserted constitutional violations and to the alleged offending policies and customs. *See* [28] ¶ 63 (outlining examples of law enforcement's use of excessive force against children during the execution of search warrants). At the pleading stage, "plaintiffs 'need only plead that the alleged incident is one of many occurring in Chicago and that a widespread

practice gave rise to those incidents.'" *Stokes v. Ewing*, No. 16 C 10621, 2017 WL 2224882, at *4 (N.D. Ill. May 22, 2017) (quoting *Kerlin v. Chi. Bd. of Elections*, No. 16-CV-7424, 2017 WL 1208520, at *7 (N.D. Ill. Apr. 3, 2017)).  Plaintiffs have done so here.  *See also White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016) (noting that plaintiff was not required to "identify every other or even one other individual who has been arrested pursuant to a warrant obtained through the complained-of process" to create an inference of a widespread practice).  *But see Rikas v. Babusch*, No. 13 CV 2069, 2014 WL 960788, at *3 (N.D. Ill. Mar. 12, 2014) (noting that prior lawsuits, which were "ultimately settled . . . [with] no finding of liability," did not "evidence a widespread municipal practice" under *Monell*).

In sum, in an exercise of "judicial experience and common sense," the Court finds that the allegations in the complaint provide enough "factual content to allow the court" to infer a widespread custom and official policy (or lack thereof).  *Iqbal*, 556 U.S. at 679.  At this early stage, it is "reasonable to infer from the DOJ [R]eport's findings—and from plaintiffs' allegations—that Chicago police officers have a widespread practice of using excessive force against children in all sorts of contexts, including when officers execute residential search warrants."  *Archie*, 2020 WL 5751185, at *3.  And, it is also "reasonable to infer that plaintiffs were victims of this practice."  *Id*.

For the foregoing reasons, the Court denies the City's motion to dismiss Plaintiffs' *Monell* claim.

### E.    Qualified Immunity

Finally, the Officers argue that they are entitled to qualified immunity on Plaintiffs' unreasonable search and seizure claims (Count I & Count II). [29] at 10, 13; [38] at 10–12, 14.  Qualified immunity protects government officials from civil liability when performing discretionary functions as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When evaluating whether qualified immunity applies, the Court must ask "two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001).  For the law to be "clearly established, the 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Price v. McCoy*, No. 19-CV-02560, 2021 WL 5179918, at *8 (N.D. Ill. Nov. 8, 2021) (quoting *Aschroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  This inquiry is an objective one; it does not consider officials' subjective motivations and gives them the benefit of the doubt. *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991).

Because "qualified immunity is designed to protect defendants from the burden of suit, as well as the burden of liability, it is a question that should be resolved as promptly as possible." *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999).  At the same time, "dismissing a § 1983 suit at [the motion to dismiss] stage on qualified immunity grounds is a 'delicate matter'" because the federal rules do not "require a

28

plaintiff to anticipate a qualified immunity defense and allege every fact needed to defeat it in the complaint." *Rusinowski v. Vill. of Hillside*, 835 F. Supp. 2d 641, 650 (N.D. Ill. 2011) (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)). While dismissal may be appropriate where "the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred," it may not be where "the existence of qualified immunity . . . depend[s] on the particular facts of a given case." *Jacobs*, 215 F.3d at 756 n.3; *see also Alvarado*, 267 F.3d at 651 ("[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds . . . [b]ecause an immunity defense usually depends on the facts of the case)).

The Court cannot decide the applicability of qualified immunity in view of all of the factual issues that remain in this case. *See Atkins v. Hasan*, 2015 WL 3862724, at *7 (N.D. Ill. June 22, 2015) ("Too little is known about the circumstances in this case to determine if, by pointing their weapons at the plaintiffs, the officers violated plaintiffs' clearly established rights."); *Tate*, 2020 WL 6715660, at *5 ("Discovery is necessary to fill in the gaps [and] determine both whether any individual officer pointed their gun at [plaintiff], and if so, whether that action was sufficiently unreasonable to deny qualified immunity."). The Court reserves this issue for another day.

**IV.    Conclusion**

In sum, the parties raise significant factual disputes which largely prevent the Court from dismissing any of Plaintiffs' claims.  Accordingly, Defendants' motions to dismiss [29], [31] are denied.


Dated:  March 23, 2022                    Entered:

                                          John Robert Blakey
                                          United States District Judge